UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| STEVENS ENGINEERS & | ) | CASE NO. 1:15 CV 1965 |
| CONSTRUCTORS, INC., | ) | 1:15 CV 1967 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | |
| | ) | |
| IRON WORKERS LOCAL 17 PENSION | ) | |
| FUND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |


This matter is before the Court on the Complaint of Plaintiff Stevens Engineers &

Constructors, Inc, ("Stevens") to enforce the Arbitration Award of Arbitrator John E. Sands in

Case No. 1:15 CV 1965, and the corresponding Complaint of Defendants Iron Workers Local 17

Pension Fund (the "Pension Fund" or "Fund") and its Board of Trustees ("Trustees") in Case No.

1:15 CV 1967, to vacate or modify the Arbitrator's Award.[1]

## PROCEDURAL BACKGROUND[2]

---

[1]

Also pending is Steven's Partial Motion to Dismiss the Fund's Second Claim for relief in
Case No. 15 CV 1967. (ECF #6) The Fund's First Claim for relief requests that the
Arbitrator's Award by vacated. The Second Claim for relief, which is derivative of the
First Claim for relief, seeks the collection of quarterly withdrawal liability payments
owed pursuant to the Fund's original withdrawal liability assessment.  The Fund notes
that it does not seek immediate payments of the original withdrawal liability assessment,
recognizing that any future continuation of such payments would only be granted if the
Court vacates the Arbitrator's Award.

[2]

The facts cited by the Court are derived from the Courts thorough review of the extensive
record submitted in this action, including without limitation, the Opinion and Award of
Arbitrator Sands, the briefing of the parties and the exhibits thereto and the transcripts of
the arbitration proceedings.

Plaintiff Stevens filed its Complaint for Judgment to Enforce Arbitration Award against the Pension Fund and its Trustees on September 23, 2015. (15 CV 1965, Doc.1)  Later that same day, the Pension Fund and its Trustees filed a Complaint against Stevens seeking to Vacate or Modify the Arbitration Award. (15 CV 1967, Doc. 1) The actions were consolidated and have proceeded under the lower case number.

This action arises from the assessment of withdrawal liability by the Trustees of the Pension Fund against Stevens under the construction industry withdrawal liability provisions of ERISA § 4203(b), 29 U.S.C. § 1383(b), and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") The MPPAA requires a contributing employer that withdraws from a multiemployer pension plan to pay its proportional share of the plan's unfunded vested benefits calculated in accordance with MPPAA's terms as of the end of the plan year preceding the plan year of withdrawal.  In the construction industry, a complete withdrawal occurs under 29 U.S.C. § 1383(b) when an employer that ceases to have an obligation to contribute under the plan and:

> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of resumption.

Stevens is a construction industry employer who, between approximately 1985 and 2013, was bound to a series of collective bargaining agreements ("CBA's") with the Iron Workers Union Local 17 and was thus obligated to make, and did make, contributions to the Pension Fund when performing iron work covered by Local 17 CBA's. Stevens did not renew the Local 17 CBA when it expired on April 20, 2013 and its obligation to contribute to the Pension Fund

2

ceased.

In September 2013 Stevens received a contract to complete the demolition, removal, replacement, upgrade and installation of new equipment for the #4 Seamless Mill Expansion Project at the U.S. Steel Lorain Mill ("No. 4 Seamless").  Stevens held the pre-job conference for the No. 4 Seamless job with representatives from all the crafts involved on October 29, 2013. Three days later Timothy McCarthy, the business manager of Local 17 Iron Workers Union, sent a letter to Stevens objecting to the assignment of certain work he believed was ironworker work to the millwrights and expressing the Union's intent to invoke the NMA dispute procedures. After Stevens replied to that letter with its explanation for the assignments, the Union took no further action to dispute the assignment.

Approximately one week after receiving Stevens' response to Local 17's complaint about the assignments, on November 13, 2013, the Trustees of the Pension Fund, led by Timothy McCarthy, now acting as the Chairman of the Fund's Board of Trustees, determined that Stevens had assigned ironworker work of the type for which Stevens had been required to contribute to the Pension Fund before the Local 17 CBA was terminated to others, including millwrights. The Trustees voted to assess withdrawal liability against Stevens in the amount of $5,065,017. Stevens requested that the Trustees review  the assessment of withdrawal liability. The Trustees considered the request and declined to change their position. Thereafter, Stevens demanded arbitration of the dispute and the parties selected Arbitrator John Sands to hear the case.[3]

---

[3]

In its principal brief, Stevens notes, and Defendants do not dispute, that Arbitrator Sands has arbitrated and mediated more than 4,000 disputes in the fields of labor, employee benefits, withdrawal liability, commercial and employment law. Arbitrator Sands has extensive knowledge of withdrawal liability disputes and chaired the International Foundation of Employee Benefit Plans' Committee that drafted the American Arbitration

3

The case proceeded to arbitration which consisted of four days of testimony, where both sides had full opportunity to adduce evidence, cross examine each other's witnesses, and to make argument in support of their respective positions. Following the hearings, each side submitted a post-hearing brief and a reply brief.  The issue as framed by Arbitrator Sands is "whether the Fund correctly assessed withdrawal liability arising out of a construction industry craft jurisdictional dispute."

Arbitrator Sands issued his Opinion and Award on August 25, 2015, finding that the Pension Fund's assessment of withdrawal liability against Stevens and its denial of Steven's request for review were unreasonable and clearly erroneous and ordering the Fund to refund Steven's interim withdrawal liability payments with interest from the dates paid.


**FACTS**[4]

Arbitrator Sands made the following Findings of Fact:

## Parties

1.     The Pension Fund is a defined benefit multiemployer pension plan within the meaning of ERISA. The Fund was jointly established by the Steel and Iron Contractors Association and Iron Workers Local Union No. 17 ("Local17") in 1965 under the Taft-Hartley Act. The Fund is 40% funded with a funding deficit of more than $170 million. It is classified as a "Red Zone" or

---

Associations's revised Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes.

[4]

The facts have been copied directly from the Arbitrator's Opinion and Award and include any formatting issues, spacing anomalies, typos, etc.

critically underfunded pension plan according to the provisions of the 2008 Pension Protection Act. Because the Fund is critically underfunded, the potential withdrawal liability for its contributing employers has become substantial.

2.      Stevens Engineers & Constructors Inc. f/k/a Stevens Painton Corporation ("Stevens") is an employer in the building and construction industry. Stevens was founded in 1970 by the merger of Stevens Corporation and Painton Corporation. Stevens is a heavy industrial construction outfit involved in power, steel, automotive, and chemical work and employs approximately 165 full-time employees. Stevens also employs anywhere from several hundred to nearly one thousand union employees at any given time due to the nature of construction work.

## Governing Agreements

3.      Through a series of Assent of Participation Agreements, Stevens was

successively bound to collective bargaining agreements with Local 17, the

last of which expired midnight on April 30, 2013. Stevens did not renew the Local 17 contract.

4.      Stevens is also bound to collective bargaining agreements with the Laborers, Carpenters/Millwrights, Operating Engineers, Boilermakers, Cement Finishers, and Teamsters unions in the geographic jurisdictions where Stevens operates. These various unions each claim craft jurisdiction that overlaps with the craft jurisdiction the Iron Workers claim for its members. Particularly at issue here is the overlapping jurisdiction of the Iron Workers and Millwrights.

5.      These are the Iron Workers' relevant collective bargaining agreement provisions that establish its jurisdiction in both geographical *and* craft terms:

5

# ARTICLE I

## CRAFT JURISDICTION

(a)   It is agreed that the jurisdiction of work covered by the Agreement is that provided for in the charter grant issued by the American Federation of Labor ("AFL") to the Bridge, Structural, Ornamental and Reinforcing Iron Workers . . . , it being understood that *the claims are subject to . . . Agreements, national in scope between the International and other International Unions covering work jurisdiction and allocation and division of work among employees* represented for the purpose of collective bargaining by such labor organizations. . . .

(b)     This Agreement shall cover and include but is not limited to the unloading, handling, . . erection, and dismantling of structural, ornamental, reinforcing steel, composite and engineered material and it is understood and agreed that the International claims for its members the fabrication, production, erection and construction of all . . conveyors, cranes (the erection, installation, handling, operating and maintenance on all forms of construction work), . . . decking (metal); grating, . . . guards, machinery (moving, hoisting and placing on foundations), making and installation of all . . . material altered in the field, such as; framing, cutting, bending, drilling, burning and welding by acetylene gas and electric machines; . . . monorails, railings (including pipe), . . . rebar tie guns, . . rigging ..., stairways, . .... wrecking and dismantling all of the above. . . .

6

*       *       *

(g) When unloading structural steel with power equipment, . . . .

*       *       *

(j) When unloading and handling materials, other than structural steel, . . .

[Emphasis added.]

## ARTICLE II

## TERRITORY

The territory covered by the Agreement shall be the territorial jurisdiction of the Union and shall include the following counties:
Cuyahoga, Ashtabula, Erie, Geauga, Huron, Lake, Medina, Portage, Summit and Lorain. . . . .

6. That Agreement's Preamble provides, in relevant part:

This Agreement is entered into by collective bargaining . . . to prevent waste, unnecessary and avoidable delays, and expenses . . . that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and further, the establishment of the necessary procedures by which these ends may be accomplished.

7. Stevens is also party to the Northeast Ohio Carpenters' Agreement, which sets terms and conditions of employment for Millwrights. Its craft jurisdiction provision covering Millwrights overlaps many of the areas and functions claimed by Iron Workers. These are some relevant terms of that Agreement:

**1.10  Millwrights and Machine Erectors**. The term "Millwrights and Machine Erectors' jurisdiction shall mean the unloading, hoisting, rigging, skidding, moving, dismantling, aligning, erecting, assembling, repairing, maintenance and adjusting of all structures . . . required to process material, handle, manufacture, or service, be it powered or receiving power manually . . . and in industries such as and including . . . but not limited to . . . steel mills. . . . The installation of . . . conveyors of all types, sizes and their supports. . . and the installation of all types of equipment necessary and required to process material either in the manufacturing or servicing. The handling and installation of. . . guards, . . . forging machines. . . . The . . . fabrication and installation of protection equipment including machinery guards . . . .

7

\*        \*        \*

> **1.12**  When a carpenter [defined as including millwright] is available, the carpenter shall be assigned to unload and distribute all materials under the Union's jurisdiction. . . . .

8.    As noted above, the Iron Workers craft jurisdiction is expressly limited by"Agreements, national in scope between the International and other International Unions covering work jurisdiction and allocation and division of work among employees. . . ."

9.    One such agreement to which Stevens, the Millwrights, and the Iron Workers are all party is the National Maintenance Agreement ("NMA"), which applies to industrial construction, maintenance, replacement, and renovation work such as the project at issue here. That Agreement's first paragraph cites its following purposes:

> Safety in all phases of work;

> No disruption of the owner's work; Performance on schedule;

> Cost-effective and quality craftsmanship;

> Productivity flexibility;

> Trained, available workforce;

> Attainable work opportunities;

> Resolution process for job site issues; and

> Consistent terms and conditions.

10.    The NMA recognizes that various crafts may claim work assignments that

are part of the "recognized and traditional jurisdiction" of other crafts. To

address such issues, it provides the following procedures:

> 3. *The Employer is required to conduct a pre-job conference, including all craft work assignments, for each project. . . .* Written craft work assignments will be distributed to the appropriate Unions, not to exceed ten (10) working days after the pre-job conference.

8

*      *      *

5. During the existence of the Agreement, there shall be no strikes, lockouts, work stoppages, or picketing arising out of any jurisdictional dispute. *Work will continue as originally assigned, pending resolution of the dispute.*

*      *      *

6. . . . *[All parties] stipulate that they will abide by the following procedures for the resolution of jurisdictional disputes.* A party challenging an assignment shall notify all affected parties, i.e. Unions and Employer, by mail FAX, or e-mail. *All disputes involving craft work assignments shall be referred to the International Unions, with which the Local Unions are affiliated, providing the International Union and the Employer an opportunity to resolve the dispute.*

7. If the International Unions and the Employer fail to resolve the dispute after five (5) working days after the date they were notified of the dispute any International Union or Employer directly involved in the dispute may refer the arbitration . . . for resolution under this procedure. . . . .

9. . . . The decision of the Umpire shall be final and binding on all parties to the dispute. . . .

[Emphasis added.]

11.     Under the NMA, craft assignments are presumed proper as assigned. Such

assignments can be challenged under the dispute resolution process. If a

matter is not resolved between an employer and the local or international

union, the unions may initiate a review by an Umpire. The Umpire's

decision is final and binding. An Umpire may not award backpay but determines disputed

assignments going forward. Until a final Umpire decision, original assignments stand as

made. As a result, if a union does not pursue the dispute resolution process under the

NMA, the work stands as it was originally assigned.

9

12.     Another "Agreement, national in scope . . . covering work jurisdiction and allocation and division of work among employees" is the May 1, 1971 agreement between the Iron Workers and the Millwrights covering "rigging in connection with the installation of machinery and/or equipment on building and construction projects" ("1971 Rigging Agreement"), Articles 3 and 4 of which allocate handling, rigging, and removal of machinery and equipment in heavy industrial plants such as the one at issue here.

13.     In a joint meeting of Iron Workers and Millwrights International Representatives within months following the 1971 Rigging Agreement's adoption, Robert McVay for the Iron Workers and Jimmy Jones for the Millwrights stipulated that the Agreement does not apply to maintenance projects, only new construction.

14.      In any event, by letter dated April 25, 2005 to Iron Workers General President Joseph Hunt, Carpenters' General President Douglas J. McCarron abrogated the 1971 Rigging Agreement citing the same reasons as he had for abrogating similar agreements regarding conveyors: "Most everyone recognized that these agreements were antiquated and non-productive." McCarron concluded, "It is our belief that by abrogating these agreements our union contractors will be more competitive and the members of both our organizations will gain market share." The 1971 Rigging Agreement has not been effective since then. Notwithstanding that fact, construction industry parties unaware of the abrogation continued to make some job assignments consistently with its terms, which underlies the Funds claim that its terms continue in effect as area practice.

10

**Stevens' Operations**

15.     Stevens' senior management was aware that Stevens faced withdrawal liability of up to $8 million if the Pension Fund were terminated by mass withdrawal. Stevens accordingly decided to stop self-performing, self hiring, and direct-hiring Local 17 ironworkers. In 2010 Stevens began to subcontract ironworker work to other heavy industrial construction contractors that are signatories to the Local 17 collective bargaining agreement, primarily Bender Constructors, Standard Construction, Chemsteel, Ambassador Steel, and Akron Erectors.

16.     While Stevens self-performed 64 ironworker hours on the US Steel Number 6 Quench and Temper Project ("6 Q&T") in 2010, a project for which it had assigned work in 2009, Stevens did not further self-perform any ironworker assignments within the jurisdiction of Local 17 after 2010. These hours on the 6 Q&T predate Stevens's decision to stop self-performing ironworker work.

17.     Stevens' Cleveland General Manager, Chet Seroka, advised clients in 2010 that Stevens would no longer directly hire Local 17 ironworkers to perform ironworker assignments in Local 17's jurisdiction. He met with US Steel, ArcelorMittal, and others to explain that Stevens would no longer self perform Local 17 ironworker work and would accordingly not apply for projects that consisted predominantly of ironworker work. Stevens has continued this work model consistently since then and has relinquished the opportunity to bid on numerous jobs, even when clients have asked it to bid on a project.

18.     On December 4, 2012, Stevens confirmed its termination decision by letter to Local 17

11

and did not renew that contract upon its April 30, 2013 expiration. Stevens has not made contributions to the Fund since then.

19.     In support of its "area practice" argument, the Fund adduced evidence concerning Stevens' work assignments at four projects that predated termination of its Iron Workers collective bargaining agreement: (a) March1997 LTV Steel 84" Cold Mill Modernization Project ("1997 LTV Project"), (b) October 2004 Rapid Discharge Rail Unloader for FirstEnergy at its Eastlake Ohio plant ("2004 First Energy Project"), (c) June 2007 Seamless Rotary Furnace at the U.S. Steel #3 Mill in Lorain ("U.S. Steel 2007 Project"), and (d) 2010 6 Q&T. All four involved assignments to ironworkers of work also within Millwrights' claimed jurisdiction and rigging assignments that tracked the 1971 Rigging Agreement. The first three, however, antedated abrogation of that agreement; and Stevens made the work assignments on No. 6 Q&T prior to its having learned of that abrogation.

20.     In September, 2013, after Stevens had terminated its Local 17 collective bargaining agreement, Stevens received a $14.5 million contract to complete the demolition, removal, replacement, upgrade and installation of new equipment for the #4 Seamless Mill Expansion Project at the U.S. Steel Lorain Mill ("No. 4 Seamless"), which the parties stipulate was subject to the NMA.

21.     In accordance with NMA's Section 3, Stevens conducted a pre-job conference on October 29, 2013 with representatives of all crafts involved in the No. 4 Seamless project. Stevens' pre-job outline listed the jurisdictional assignments for all aspects of the project with these

12

relevant provisions for millwrights and ironworkers:

Demolition:
Existing Equipment and                    Millwrights Remove / Laborers
 Platforms Scrap-out

Concrete Foundation Installation:
Rebar Installation                        Iron Workers

Trench Covers                             Iron Workers

Process Equipment:

Unload Platforms and                      Iron Workers

Equipment to Storage

Building Structural                       Iron Workers

Modifications

Handle and Install Platforms              Iron Workers

from Storage

Handle and Install Mechanical             Millwrights

Equipment from Storage

## Local 17's Jurisdictional Dispute

22.    Three days later, on November 1, 2013, Local 17 Business Manager Timothy McCarthy

wrote to Stevens' Project Director Rob Dolacki invoking the NMA and officially protesting "The

assignment of 'removal of existing equipment and platforms to millwrights remove, and the

13

handle and install mechanical equipment from storage millwrights' based on Stevens'
abandonment "of the well documented use of the 1971 Ironworker Millwright Rigging
Agreement in the assignment of trade jurisdiction." McCarthy demanded "documentation to
support Stevens' decision to abandon the use of the 1971 Rigging Agreement for the equitable
distribution of work." He concluded with these important sentences: "Iron Workers' Local No. 17
will await written response by November 6, 2013. Please be advised that all remedies under the
NMA will be pursued by this organization." [Emphasis added.] McCarthy testified that, at the
time he wrote this letter, he was aware that -the 1971 Rigging Agreement had been abrogated.

23.     As required, Dolacki, who did not then know of the 1971 Rigging Agreement's
abrogation, responded on November 6th, stating that Agreement applied only to new
construction and not maintenance projects like No. 4 Seamless and in any event does not require
all rigging to be performed by ironworkers. Dolacki concluded with this paragraph:

> Stevens Engineers and Constructors has historically assigned
> removal/demolition to either the installing trade, or the laborers, or a combination there
> of *[sic],* ensuring that the removal/demolition is performed safely, and without damage
> to the connected  facility. Since many of the existing equipment platforms are
> connected to the process equipment, the current assignments associated with this
> removal/demolition maintain this. However, if the platform [is] freestanding,
> self-supporting we will have the Iron Workers remove and the Laborers scrap.

24.     Having responded as required, Dolacki awaited the next step of the NMA's dispute
resolution procedure, referral to the international unions involved. During that period, Dolacki
received a call from Iron Workers Business Agent Scott Munnings, McCarthy's subordinate, who
wanted to sit and discuss the assignments. Dolacki responded that, as McCarthy had written, the
parties were to follow the NMA's dispute resolution procedure.

14

25.     Neither Local 17 nor the Iron Workers International pursued the dispute further in accordance with NMA dispute resolution process. Based on the lack of response from Local 17 or the international unions to his November 6th submission, Dolacki properly inferred that the work assignments included in the original pre-job conference were correct and accepted by all of the crafts involved in the project.

26.     On two occasions during the entire No. 4 Seamless project Stevens' employees in other unions did perform work that Stevens' pre-job conference report did assign to ironworkers:

>      (A) On one night during the first outage in late November 2013, when Stevens' carpenters and laborers were preparing a foundation to be poured the next day, they discovered that some of the rebar that Bender ironworkers were supposed to have installed that day was missing. Without direction or authorization from any Stevens manager they installed a three- to four-square-foot area of rebar that night so that concrete could be poured the next morning. The next day Bender's Iron Workers foreman, Wayne Gibbons, discovered the new rebar and complained to Stevens' Project Manager, Harry Mertz. Mertz investigated, confirmed what had happened, told Stevens' carpenters and laborers they were not authorized to perform such work, and apologized to Gibbons, assuring him that no other crafts than ironworkers should do that work. And Stevens' contractor's ironworkers in fact installed all other rebar on the project.

>      (B) On January 24, 2014, Chet Seroka, Stevens' General Manager in Cleveland, received an email from Russ Metzger of Standard Construction stating that millwrights were performing ironworker work. This was the first notice that Stevens received of millwrights doing work that Stevens had properly assigned to ironworkers. Seroka investigated and learned that millwrights had begun installing grating and handrails to the charge/discharge machine, work not authorized or assigned by Stevens to millwrights. Stevens immediately stopped the millwrights' performance of that ironworker work and called Bender, a Local 17 signatory, to do that work. Seroka told Metzger that Stevens's employees were not to do any ironworker work and that Seroka would ensure that Stevens' NMA assignments were being followed. Seroka did not receive any other formal or written complaints from Metzger or anyone else about millwrights doing work Stevens had assigned to ironworkers at No. 4 Seamless, nor did Mertz or Dolacki.

15

The total such work that Stevens had assigned to ironworkers but that other unionized crafts performed without authorization or direction by Stevens amounted to less than twenty hours. Stevens subcontracted 8,000-9,000 ironworker hours to Bender and more to other Local 17 signatory employers. That unauthorized work accordingly amounts to less than two tenths of one percent of the work subcontracted to ironworker employers. I find that *de minimis* work was beyond the scope of employment of the employees who did it without Stevens' direction or authorization and that it was accordingly not ironworker work that Stevens continued to perform after termination of its obligation to contribute to the Fund for such work.

27.     As noted above, McCarthy never responded to Stevens' November 6, 2013 letter. McCarthy testified that he did call Bill Dean, the Iron Workers' District Council President, an International Officer, to complain about Stevens' work assignments on No. 4 Seamless, but McCarthy submitted nothing in writing. He certainly did nothing to comply with NMA Section7's mandate that "All disputes involving craft work assignments *shall be referred* to the International Unions, with which the Local Unions are affiliated, providing the International Union and the Employer an opportunity to resolve the dispute."

28.     From this failure to pursue the NMA procedure and McCarthy's testimony that his only later involvement with the International was as Trustee to request that Dean send him Umpire decisions in preparation for this arbitration, I infer that McCarthy affirmatively decided as a union official not to submit this jurisdictional dispute to determination through the NMA

16

dispute resolution procedure but instead to pursue relief against Stevens as a Fund Trustee through the withdrawal liability process.

### The Fund's Assessment of Withdrawal Liability

29.     McCarthy, who also served on and chaired the Fund's Board of Trustees, reported to Fund counsel that Stevens was assigning work to millwrights that ironworkers should be performing as they had in past such projects. At the Trustees' November 13, 2013 meeting —just one week following Stevens' response to Local 17's NMA complaint— McCarthy made this report to the Trustees:

> . . . Chairman McCarthy explained that Stevens was starting a project at the U.S. Steel mill. He stated that prior to the withdrawal from the Collective Bargaining Agreement with Iron Workers Local 17, Stevens used ironworkers to perform the work at the same mill on several occasions over the years. However, in October, Stevens put together a bid to perform the same work using millwrights. [Fund Counsel] explained that under the building and construction industry exception to withdrawal liability, generally a construction employer that withdrawals [sic] from the CBA will not be liable for withdrawal liability if they do not return to work in the same jurisdiction without making contributions to the Pension Fund. In this situation Stevens is performing the same exact work within 5 years after May 1, 2013 in the jurisdiction covering the Pension Fund but will not have an obligation to make contributions to this Pension Fund. This triggers withdrawal liability. [Fund Counsel] stated that Stevens should be assessed withdrawal liability.

> On this motion by Trustee Fisher seconded by Trustee Cusick, the Board of Trustees voted to assess withdrawal liability against Stevens for the reasons stated above:

> MOTION, to assess withdrawal liability against Stevens as the returned to the jurisdiction of Local 17 and are performing the same work performed prior to withdrawing from the Collective Bargaining Agreement.

30.     In presenting the issue to the Trustees, McCarthy at no time told them that

unionized millwrights were doing the work the Iron Workers claimed.; that Stevens claimed the assignments had been properly made to union millwrights; that the Iron Workers had chosen not to pursue its jurisdictional beef through the NMA's dispute resolution procedure; that, under the NMA, Stevens' assignments to the millwrights stood as made; that Local 17 ironworkers were performing work for and the Fund was receiving contributions from Stevens' contractor, Bender, or that the 1971 Rigging Agreement on which rested the Iron Workers' claim of entitlement to the disputed work had been abrogated in 2005. Nor did he share Dolaki's November 6th letter responding to Local 17's jurisdictional claim.

31.     I find that, on November 13th the Trustees voted to assess withdrawal liability because Stevens had assigned work to millwrights that McCarthy and Fund Counsel thought should have been assigned to ironworkers. Essentially the Trustees decided a craft jurisdictional dispute in the Iron Workers' favor that the Iron Workers' collective bargaining agreement vested sole authority to decide to the NMA Umpire.

32.     Some time after that decision, McCarthy directed Local 17's shop steward at the No. 4 Seamless site, Richard Crow, to start recording and emailing reports of millwrights doing work that ironworkers had done on past Stevens projects at U.S. Steel's Lorain facility. Crow's first such email, sent January 21, 2014, after the January 16th Trustees meeting that approved the November 13th meeting's minutes describing their decision to assess withdrawal liability, contained retroactive reports of such work dating back to late November, after the assessment decision. I accordingly find that the Trustees based their assessment decision solely on Stevens' October 29th pre-job conference report.

33.     On January 17, 2014 the Fund sent its Notice and Demand for Withdrawal

18

Liability to Stevens in the amount of $5,065,017. That letter's opening paragraph states the Fund's basis for assessment:

> The purpose of this Notice is to inform you that due to the fact that Stevens has returned to work in the jurisdiction of the Bridge, Structural, Ornamental and Reinforcing Iron Workers Local Union No. 17 AFL-CIO within five (5) years of withdrawing from the Collective Bargaining Agreement and for which no contributions were paid into the Iron Workers Local 17 Pension Fund   ("Pension Fund"), your Company is now liability *[sic]* under ERISA Section 4203(a). The Board of Trustees determined that Stevens is performing the same work at the same facility that was previously performed by ironworkers; however, contributions are not being made to the Pension Fund.

34.     On March 13, 2014 Stevens timely requested review of the assessment pursuant to ERISA Section 4219(b)(2)(A) disputing the Fund's determination that Stevens had returned to work in Local 17's jurisdiction. Stevens defended its work assignments by furnishing additional information and documentation concerning the collective bargaining agreement's limitation of Local 17's jurisdiction by the International's agreements with other unions, the limitation of the 1971 Rigging Agreement on which Local 17 relied to new construction, Local 17's invocation and then abandonment of the NMA's dispute resolution procedure to vindicate its jurisdictional claims, a failure that accepted Stevens' work assignments in the No. 4 Seamless maintenance project at issue, that bound the Fund, and that required reversal of its determination that Stevens had returned to performing covered work.

35.     On May 14, 2014, the Trustees met and considered Stevens' request for review. Each Trustee received a folder of materials relating to the request for review. Along with a privileged memorandum from Fund counsel, the Trustees received Stevens' October 29, 2013 Pre-Job Conference Outline; the 1971 Power Rigging Agreement; Stevens' June 2007 Pre-Job Conference Outline for the U.S. Steel #3 Rotary Furnace Project; Stevens' October 19, 2004

19

Pre-Job Conference Outline for the First Energy Project; Stevens March 11, 1997 Pre-Job Conference Outline for the LTV Steel Cold Mill Modernization; and Crow's four emails describing his personal as well as second-hand observations of millwrights' performance of iron workers' work, all of which occurred *after* the Trustees' November 13th decision to assess withdrawal liability. The Trustees also received the letters between Stevens and Local 17 relating to the assignments of work at the No. 4 Seamless project. The Trustees were informed that Pension Fund contribution reports and Local 17 Steward Reports confirmed that Stevens had paid contributions based on work performed by iron workers at the 2007 #3 Seamless Rotary Project. Again, neither McCarthy nor Fund Counsel informed the Trustees that the 1971 Rigging Agreement had been abrogated in 2005 notwithstanding that they both knew that fact.

36.     Essentially, the Trustees received all of the evidence that Stevens and Local 17 would have presented to the Umpire under the NMA's dispute resolution procedure that the Local 17 collective bargaining agreement incorporates by reference but that Local 17 and the Iron Workers International failed to use.

37.     After review of the documents and discussion, the Trustees sustained Local 17's jurisdictional claim to the work Stevens had assigned to millwrights and unanimously denied Stevens' request for review. The Trustees, through counsel, notified Stevens of the decision on May 27, 2014.

38.     Stevens timely demanded arbitration on July 24, 2014.

(Opinion and Award, ECF #1, Ex.4, 3-23)

### **ARBITRATOR'S CONCLUSIONS OF LAW**

20

Arbitrator Sands framed the issue that was presented to him as "whether the Fund correctly assessed withdrawal liability arising out of a construction industry craft jurisdictional dispute."  He determined that the Fund based its decision to assess withdrawal liability solely on Steven's allocation of work at the October 29, 2013 pre-job conference. Local 17 initially challenged some of the assignments and notified Stevens of its intention to pursue the NMA dispute resolution procedure. In the meantime, under the terms of the NMA, work continued "as originally assigned pending resolution of the dispute."

However, Local 17 ultimately elected not to submit its jurisdictional challenge to the NMA's dispute resolution procedure, thus in accordance with the terms of the NMA, Steven's allocation and division of work between ironworkers and millwrights stood as originally assigned. As Local 17's collective bargaining agreements incorporate the NMA by reference in its Craft Jurisdiction definition, Arbitrator Sands determined that Local 17 abandoned its claim of contractual jurisdiction over the work that Stevens had assigned to millwrights. (Opinion and Award at 25)

Further, in order for there to be a complete withdrawal under ERISA  §1383(b)(2)(B) an employer who has ceased to have an obligation to contribute under a plan must continue to perform "<u>work in the jurisdiction of the collective bargaining agreement </u>of the type for which contributions were previously required, or resume <u>such work </u>within 5 years..." (emphasis added) Arbitrator Sands determined that the disputed work Stevens assigned to the millwrights was not in the craft jurisdiction that  Local 17's collective bargaining agreement defines and thus Stevens did not resume "such work" within 5 years after April 30, 2013, the date on which it ceased to have an obligation to contribute to the Fund.  (Id.) Accordingly, Arbitrator Sands determined that

the Trustees' determination to the contrary was clearly erroneous. (Id.)

Arbitrator Sands noted that § 1383 also requires such work to be work "of the type for which contributions were previously required," and concluded that because the work at issue was performed by millwrights under Stevens's unchallenged assignment, that work is not work for which contributions had ever been required to the Iron Workers Local 17 Pension Fund. As such, he determined that the Trustees' determination to the contrary was clearly erroneous. (Id. at 25-26)

Finally, Arbitrator Sands noted that the Trustees' use of the withdrawal liability process to determine a work jurisdiction dispute between two NMA-party unions was unreasonable and opined that what really happened here was that Local 17 used the Fund as a cat's paw in its turf war with the Millwrights over craft jurisdiction and to punish Stevens for having terminated its Iron Workers collective bargaining agreement.  (Id. at 26-27) The parties have submitted all of the evidence received by the Arbitrator during the arbitration proceedings.  In addition, each side has filed opening briefs and reply briefs.  Counsel for both sides participated in oral argument before the Court.  Further, each side filed post argument briefs. This matter is now ready for decision.

## THE TRUSTEES' AND PENSION FUND'S ASSIGNMENTS OF ERROR[5]

The Trustees assert that the Arbitrator's finding that no withdrawal occurred under 29 U.S.C. § 1383(b) is clearly erroneous for a number of reasons:

---

[5] When discussing the joint claims of the Trustees and the Pension Fund, the Court will refer to both entities as the "Trustees".

22

First, the Trustees argue that Local 17's contractual waiver due to its failure to challenge Stevens' assignations of rigging work for the project at issue is immaterial to the Trustees' determination of withdrawal liability.

Second, even if Steven's assignments of rigging work to the millwrights were deemed proper under the NMA, such a finding would be irrelevant and immaterial to the Trustees' determination of withdrawal liability because Steven's resumed the "same work in the same area" for which contributions to the Pension Fund were previously required, resulting in a reduction of the Pension Fund's contribution base.

Third, the Arbitrator's finding that no withdrawal occurred despite acknowledging that Steven's millwrights performed certain work that had been assigned by Stevens to the ironworkers because the quantity of work performed was *de minimis* and was beyond the scope of employment of the employees who did it without Stevens' direction or authorization is clearly erroneous. The Trustees assert that there is no "*de minimus*" exception in the determination of whether a withdrawal occurred under § 1383(b). Further, the Trustees argue that the Arbitrator applied the incorrect legal standard to determine that the resumed work was "beyond the scope of employment" of the Stevens employees who performed it.

Fourth, the Arbitrator erred by failing to consider all of the Local 17 CBA bargaining unit work resumed by Stevens at the project which would have been sufficient to trigger withdrawal liability.

## STANDARD OF REVIEW OF ARBITRATOR'S AWARD

23

The Sixth Circuit has recognized that the judicial review provided pursuant to the MPPAA is extremely narrow, because "[i]n any proceeding under subsection (b) ... there shall be a *presumption, rebuttable only by a clear preponderance of the evidence,* that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c) (emphasis added). Moreover, reviewing courts must give great deference to an arbitrator's determination because of the MPPAA's strong policy favoring arbitration of withdrawal liability disputes. *Mason & Dixon Tank Lines, Inc. v. Central States Pension Fund,* 852 F.2d 156, 163–64 (6th Cir.1988) (stating that arbitration is the "preferred method" for resolving withdrawal liability disputes and that "under the MPPAA 'arbitration reigns supreme' "). *Sherwin Williams Co. v. New York State Teamsters Conference Pension, Ret. Fund,* 158 F.3d 387, 392 (6th Cir. 1998). Thus, district courts review an arbitrator's findings of fact under the "clearly erroneous" standard. *Sherwin-Williams Co. v. New York State Teamsters Conference Pension and Retirement Fund,* 969 F.Supp. 465 (N.D.Ohio 1997). "Clearly erroneous" means that the reviewing court has a definite and firm conviction that a mistake has been committed. *Concrete Pipe and Products v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Santa Fe Pacific Corp. v. Central States Pension Fund,* 22 F.3d 725, 727 (7th Cir.), *cert denied,* 513 U.S. 987, 115 S.Ct. 483, 130 L.Ed.2d 396 (1994.) ("A finding is clearly erroneous if the reviewing court, after duly acknowledging the superior proximity of the fact finder to the witnesses, is firmly convinced that the finding is erroneous.") Under the clearly erroneous standard, a "court may not reverse the fact–finder's decision, even if it might come to a different conclusion, if the fact–finder's account of the evidence is plausible in light of the record viewed in its entirety. The question for the reviewing court is not whether it concurs with the arbitrator's decision but instead whether, on the entire record, it is left with the definite and firm conviction that a mistake has been committed.. *Sherwin-Williams, supra,* 969 F. Supp. at 471-72 citing

*Anderson v. Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) and

*Zenith Radio Corp. v. Hazeltine Research, \*472  Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d

129 (1969).

Unlike an arbitrator's findings of fact, which are presumed to be correct, a court reviews

the arbitrator's conclusions of law *de novo. Sherwin-Williams*, 969 F.Supp. at 472. Mixed

questions of fact and law, are generally subject to the clearly erroneous standard. *Id.* The use of

the more deferential standard of review is based upon the recognition that "the dominant theme

in MPPAA's resolution process is deference to the person who hears the evidence, thus, an

arbitrator's decision on mixed questions of fact and law may only be set aside for clear error.

*Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994 (7th

Cir.1993), *Aff'd*, 513 U.S. 414, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995); *Chicago Truck Drivers

Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1410-11 (7th Cir.1989)(recognizing that

substantial deference ought to be given to the decision of an arbitrator with special expertise in

the area of labor and pension law.)  Usually, determinations of whether a withdrawal occurred

present mixed questions of fact and law subject to the clearly erroneous standard of review.

*Sherwin-Williams*, 969 F. Supp. At 472

An exception to the use of the clearly erroneous standard with respect to review of a

mixed question of law and fact has been recognized where the material facts in the case are

stipulated or are not disputed by the parties. See *Technical Metallurigical Services, Inc. v.

Plumbers and Pipefitters Nat. Pension Fund*, 213 Fed Appx. 268 (5th Cir. 2007) (where parties

stipulated the facts before the arbitrator, there remains only a question of law.)  In that situation,

courts have applied the de novo standard of review.

The parties here vehemently disagree on whether the facts in this case were in dispute. The parties did submit some stipulated facts to the arbitrator, however, the arbitrator took four days of testimony and the Trustees disagree with many of his factual findings. As such, this is not a case like *Concrete Pipe* or *Technical Metallurigical Services* where the material facts are stipulated or not in dispute.  Accordingly, the Court will apply the clearly erroneous standard on the questions of fact and mixed questions of law and fact and de novo review for pure questions of law.

### DISCUSSION

Moving to the Trustees' first assignment of error, the Trustees assert that the Union's failure to challenge Stevens' assignment of the work at issue through the NMA process is irrelevant to the validity of the Trustees' determination of withdrawal liability because under ERISA § 515, 29 U.S.C. § 1145, an employer cannot rely on contractual defenses such as waiver, estoppel or acquiescence based on a union's failure to exhaust grievance remedies to escape its obligation to contribute to a multiemployer pension fund.  They argue that ERISA § 1145, which applies when multiemployer pension funds are seeking to collect delinquent contributions, should apply in the context of a multiemployer pension fund seeking withdrawal liability under ERISA § 1383.[6]

ERISA § 515 provides that:

> Every employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms of a
> collectively bargained agreement shall, to the extent not inconsistent with

_____

[6]This argument presents a question of law that the Court will review de novo.

law, make such contributions in accordance with the terms and conditions
of such plan or agreement.

This provision permits a plan to rely on the literal terms of written commitments between the plan, the union, and the employer and, as a result, "the actual intent or understanding of the contracting parties is immaterial when the meaning of the language is clear."*Orrand v. Scassa Asphalt, Inc*., 794 F.3d 556, 562 (6th Cir. 2015) *citing Baker & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998). Courts are agreed that  the effect of this section is "to accord ERISA funds special status, akin to a holder in due course under commercial law, and entitle them to enforce the writing regardless of the defenses that might be available under the common law of contracts. *Trustees of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling and Partition Co.*, 2002 WL 35018235 at *3 (6th Cir. 2002) citing *N.W. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 651, 654 (6th Cir. 2001), *cert denied*, 122 S.Ct. 1605, 1606 (2002).  Congress passed § 515 to address the concern that "simple collection actions brought by plan trustees [had] been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plan's entitlement to the contributions and steps [were required] to simplify delinquency collection." *Operating Engineers Local 324 Health Care Plan v. G & W Construction Co.*, 783 F.3d 1045, 1051-52 (6th Cir. 2015) *citing Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 87 (1982). The Sixth Circuit has noted that Congress added Section 515 "to free [] pension and welfare funds from defenses that pertain to the unions' conduct, ... and therefore "[a] claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit." *Orrand, supra*, 794 F.3d at 563, *quoting Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d, 454, 460 (6th Cir. 1989).

Arbitrator Sands rejected as inapposite the Trustees' argument that in accordance with § 515, it was not bound by Local 17's waiver of its jurisdictional claim to the work at issue by having failed to pursue the NMA jurisdictional dispute procedure. He noted that all of the cases cited by the Fund involved fund claims for delinquent contributions in which the funds were "suing as fiduciaries under ERISA Section 502(a)(3)(B)(ii) to enforce their independent rights to collect contributions under the authority of ERISA Section 515. The Trustees here have no such independent right to enforce Local 17's claims to craft jurisdiction against NMA parties." (Opinion and Award, at 28)

The Trustees, relying on a Seventh Circuit case,[7] contend that § 515 should be applicable to withdrawal liability cases since at least one court has applied § 515 to define an employer's obligation to contribute to a pension fund and the limited defenses that may be applicable thereto, to determine when withdrawal liability was triggered as withdrawal liability attaches only when an employer ceases to have an obligation to contribute to a fund. In *Schilli*, the employer Schilli, the parent corporation of three wholly owned subsidiaries, participated in the Plaintiff Fund for a number of years pursuant to a series of collective bargaining agreements with the Teamsters Local 878 which obligated Schilli to contribute specified amounts to the Fund on behalf of all the employees in the bargaining unit. In addition to the CBAs, Schilli and Local 878 signed a separate document–the Participation Agreement–which obligated Schilli to contribute a set amount per week to the Fund. The Participation Agreement contained a clause that provided that the Agreement shall continue in effect until such time that the Employer notifies the Fund(s) by certified mail that the Employer is no longer under legal duty to make contributions to the Fund(s). In November 1997, the employees of one of Schilli's subsidiaries, Truck Transport,

---

[7] *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663 (7th Cir. 2005)

voted to decertify the union which the NLRB confirmed. The employer did not notify the Fund of the decertification and continued to operate as usual. Truck Transport submitted its monthly contributions to the Fund in December 1997 and January 1998. In January 1998 Schilli closed the Truck Transport terminal and ceased contributing to the Fund. The Fund determined that Truck Transport had partially withdrawn from the Fund in 1997 and completely withdrawn in 1998 and demanded payment accordingly. Schilli contested the assessment and the issue went to arbitration. The arbitrator, noting that an employer withdraws from a plan only when it ceases to have an obligation to contribute, found that the Participation Agreement bound Truck Transport to contribute to the fund until it complied with the Agreement's notice provision and that Truck Transport had not given the prescribed notice in 1997. Thus, he found that Truck Transport had not withdrawn in 1997 and Schilli could not be assessed withdrawal liability for 1997. The Fund filed an action in the Northern District of Illinois to vacate the arbitrator's award but the district court affirmed the award. On appeal from that decision, the Seventh Circuit affirmed. The Seventh Circuit assumed, without deciding, that if Truck Transport would have been liable in a § 1145 action for contributions through 1998, it remained "obligated to contribute" for withdrawal purposes until then. The Court determined that the decertification of Local 878 did not terminate Truck Transport's obligation to contribute, for withdrawal liability purposes, by operation of law. Further, while decertification terminated Local 878's right to enforce the Participation Agreement, it did not terminate the Fund's ability to collect contributions in a § 1145 action. Finally, the Court could not infer on the basis of the record before it that the Fund had waived the notice requirements of the Participation Agreement in 1997, thereby relieving Truck Transport of its obligation to contribute and triggering withdrawal liability for that year.

*Schilli* does not really address the situation at issue here. The question of when an

employer's obligation to contribute to a pension fund ceases is controlled by § 1145.  The question here is not when Stevens' obligation to contribute to the Fund ceased. The question here is whether the special status enjoyed by multiemployer pension funds under § 1145 applies to the assessment of withdrawal liability arising from an inter-union craft jurisdictional dispute. Neither the Court nor the parties have located any precedent directly on point.

Moreover, courts have disagreed with respect to whether a union's failure invoke the jurisdictional dispute procedure can bar a Fund's effort to seek contributions under §1145 for work assigned to a different union. In *Carpenters Fringe Benefit Funds of Illinois v. McKenzie Engineering*, 217 F.3d 578 (8th Cir. 2000), the employer McKenzie was subject to collective bargaining agreements with several craft unions, including the carpenters Local 410 (Iowa territory including Keokuk, IA), and while it had no CBA with carpenters Local 166 (Illinois territory including Rock Island, IL), McKenzie agreed that a Memorandum of Agreement incorporates by reference a CBA that covers Local 166's territory and contains the same relevant terms and conditions as the Local 410 CBA.  In 1995, McKenzie had a contract to repair an icebreaker protecting a dam at Keokuk.  McKenzie's crew included two operating engineers, one boilermaker, and four carpenters who were members of Local 410. When the project fell behind schedule McKenzie replaced the four carpenters with non-union workers and finished the job.  In late 1996, McKenzie was awarded a project to repair the Crescent Bridge spanning the Mississippi between Rock Island and Davenport, IA. As work began, Carpenters Local 166 claimed the right to the carpenter work on the project. Instead of hiring Local 166 carpenters, McKenzie signed a CBA with the Operating Engineers Local 150 covering the Crescent Bridge project and assigned the work to Local 150, which issued Operating Engineers work permits to the members of McKenzie's crew who had successfully finished the Keokuk dam project. The

30

Funds (and Local 410 and later Local 166) filed suit in January 1997 asserting that McKenzie failed to make contractually required contributions for employees within the territorial and occupational jurisdiction of Local 410 and Local 166. The Funds' claim for unpaid contributions was based entirely on an audit of McKenzie's payroll records from April 1, 1994 to December 31, 1997. Noting that under ERISA § 515, the Funds may collect only those contributions that McKenzie was contractually obligated to pay, the Court determined on the record before it that the Audit report on which the Funds relied for its claim failed to establish a claim for contributions contractually owed by McKenzie under the collective bargaining agreements with the Carpenters and its local unions. With respect to the Crescent Bridge project, the Court found that the record did not support a finding that any of the Crescent Bridge work was covered by a CBA with the Carpenters, as opposed to the Operating Engineers.

> On this record, McKenzie was contractually free to assign the Crescent Bridge work to either union, or part of the work to each union. Any union aggrieved by that assignment could invoke the inter-union jurisdictional dispute procedure, which results in a final work assignment decision prospectively binding on McKenzie....Because Local 166 did not invoke that procedure, the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union.

*McKenzie*, 217 F.3d at 585. The Sixth Circuit considered and relied on *McKenzie* in deciding *Trustees of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling and Partition Company Inc.*, No. 01-1396, 2002 WL 35018235 (6th Cir. Oct. 4, 2002). *In Ohio Ceiling*, the plaintiff Funds (associated with the Bricklayers Union) sought contributions from Ohio Ceiling to the Bricklayers funds for work it assigned to the Carpenters instead of Bricklayers. The Sixth Circuit framed the issue as "whether plaintiffs could demonstrate a contractual obligation to make contributions to the bricklayers funds when the carpenters union agreements purported to cover

31

the same work, the work was assigned to employees covered by the carpenters union agreements and contributions were made in full to the carpenters union funds." *Id.* at *9. The Court specifically noted that *McKenzie* supports the view that the plaintiff Funds should not be able to establish an entitlement to contributions for work assigned to another union claiming jurisdiction over the work without invoking procedures for resolving the jurisdictional work assignment dispute. "Looking at the basis for the protections afforded to ERISA plans under § 515, nothing suggests that it was intended to afford ERISA fiduciaries a weapon against employers in undeclared jurisdictional disputes with competing unions." *Id.* at *10. The Court determined that the Bricklayer Funds failed to demonstrate that Ohio Ceiling had a contractual obligation to pay contributions for the hours of disputed work performed by the carpenters union. *Id.*

On the other side, a district court in Rhode Island expressly disagreed with the Eighth Circuit's decision in *McKenzie*, and its position that a union's failure to invoke inter-union jurisdictional dispute procedures acts as a bar to the Fund(s) associated with the union from later seeking contributions under ERISA. *Rhode Island Carpenters Annuity Fund v. Trevi Icos Corp.*, 474 F.Supp.2d 326, 333-334 (D. RI 2007). Noting the cases which reiterate the lack of permissible defenses to a Union's claim for contributions under § 515, and the settled authority that a pension fund is a distinct legal entity from its constituent union, the Court determined that the union's failure to invoke the jurisdictional dispute clause will not operate to bar the fund's action for contributions under ERISA. *Id.* at 334. Nevertheless, the Court agreed that even if the Fund's action is permitted under ERISA, an employer is not required to contribute to the plaintiff Fund unless it is contractually obligated to do so.

The Trustees point to two recent Sixth Circuit cases as support for the *Trevi Icos* position,

32

that a contractual defense, such as waiver, does not limit a pension funds' ability to enforce an employer's obligation to contribute under the express terms of a collective bargaining agreement. *See Operating Engineers Local 324 Healthcare Plan v. G&W Constr. Co.*, 783 F.3d 1045 (6th Cir. 2015); *Orrand v. Scassa Asphalt, Inc*., 794 F.3d 556 (6th Cir. 2015). Both cases are delinquent contribution cases subject to ERISA § 515. Neither involved jurisdictional disputes among competing unions. In both cases the Court reiterated the special status afforded to ERISA funds under § 515 which permits funds to enforce the written contracts without regard to the understandings or common-law contract defenses of the original parties. Further, both note that conduct of the union that is contrary to the written provisions of the agreements cannot affect a fund's right to collect contributions that are due and owing to the fund. Interestingly, in *G&W Construction*, the Court reviewed a district court's denial of the plaintiff Fund's motion to strike the employer's affirmative defenses of laches, equitable estoppel and waiver. The Court determined that the motion to strike the defenses of equitable estoppel and laches should have been granted and declined to consider " whether it is appropriate to bar the affirmative defense of waiver in this ERISA § 515 collection action."  *G&W Constr. Co.*, 783 F.3d at 1057.

Even if the Court accepts the *Trevi Icos* view that a pension fund's special status under § 515 can be used as a weapon in an inter-union jurisdictional contest in delinquent contribution actions; as Arbitrator Sands noted, there is no precedent permitting the application of §515 in an action for the collection of withdrawal liability, especially in the context of the inter-union jurisdictional dispute at issue here. Accordingly, Arbitrator Sands did not err in declining to apply § 515 in this instance. In any event, the Trustees here have not been barred from assessing withdrawal liability as a result of Local 17's election not to dispute Steven's assignment of work through the NMA dispute process. Rather, the arbitrator determined that such assessment was

unreasonable and clearly erroneous in these circumstances.

Next, the Trustees assert that Arbitrator Sands clearly erred in finding that no withdrawal occurred under § 1383(b) because even if Steven's assignments of rigging work to millwrights were deemed proper under the NMA, such a finding would be irrelevant and immaterial to the Trustees' determination of withdrawal liability because Steven's resumed the "same work in the same area" for which contributions to the Pension Fund were previously required, resulting in a reduction of the Pension Fund's contribution base. The Trustees note that if Stevens had assigned rigging work on the 2013 project at issue as it had in the past, to a composite iron workers-millwrights crew pursuant to the 1971 Rigging Agreement and current industry practice, then the subcontractor for the iron work, such as Bender, would be obligated to contribute to the Fund so the Fund would not have experienced a reduction of its contribution base. However, the Trustees assert that Stevens broke from the 1971 Rigging Agreement and industry practice when it assigned work on this job by causing portions of rigging work that would have been assigned to ironworkers (with corresponding contribution obligations to the Fund) to be diverted to millwrights for whom there was no obligation to contribute to the Fund. As such, contrary to Arbitrator Sand's finding, this reduced the Fund's contribution base.[8]

The 1971 Rigging Agreement between the International Union of Ironworkers and the International Union of Carpenters was adopted to avoid jurisdictional disputes between the two unions related to "rigging in connection with the installation of machinery and/or equipment on

---

[8]

Arbitrator Sands took extensive testimony on the status of the 1971 Rigging Agreement and industry practice. As such, whether Stevens' job assignments comport with the Rigging Agreement and/or current industry practice, or what current industry practice may be, is a factual issue subject to the clearly erroneous standard of review.

34

building and construction projects." Within months of the signing of the 1971 Rigging

Agreement, representatives of both International Unions stipulated that the Agreement does not

apply to maintenance projects, only new construction. The General President of the Carpenters'

International abrogated the 1971 Rigging Agreement on April 25, 2005 in a letter to the Iron

Workers' General President, noting that "[m]ost everyone recognized that these agreements were

antiquated and non-productive." Arbitrator Sands found that the Rigging Agreement has not

been effective since April 25, 2005, although industry parties not aware of the abrogation

continued to make some job assignments consistently with its terms. (Opinion & Award, at 9-19)

Neither the Trustees nor Stevens disputes these factual findings of Arbitrator Sands[9].  The

dispute arises in the Trustees' claim that the provisions of the 1971 Rigging Agreement have

become area practice which they contend must still be followed by all employers when making

craft assignments, regardless of efficiency, requirements of the specific job or other concerns.[10]

Despite the Trustees' assertion, it appears that different employers who are all signatories of the

Local 17 CBA, assign rigging differently. What is clear is that Arbitrator Sands evaluated

---

[9]

The Defendants argued at various times before the Arbitrator and in some briefing that
the 1971 Rigging Agreement was not abrogated.  However, by the time of oral arguments
before this Court, the Defendants' position had evolved into their position that the
provisions of the 1971 Rigging Agreement had become area practice.

[10]

The Trustees' position would prevent an employer like Stevens who ceases its obligation
to contribute to a multiemployer pension plan, from altering or adapting its practice of
assigning work to the union associated with that pension fund in the future, despite any
changes in technology, building or industry practices or the requirements of a future job.
Thus, Arbitrator Sands stated that Fund Trustees do not have authority to determine inter-
union work disputes because "the Fund's claim here of authority for the Trustees to
resolve such disputes means that, even if Local 17 had followed the NMA procedure and
lost, the Trustees could still have assessed withdrawal liability notwithstanding an
Umpire's decision that the subject work fell outside the jurisdiction of Local 17's
collective bargaining agreement. That proposition's absurdity compels its rejection."
(Opinion & Award, at 26-27)

documentary evidence as well as the testimony of several witnesses on this point. The Fund's witnesses testified that work assignments continued to be made, for the most part, in accordance with the Rigging Agreement after it was abrogated. Stevens' witnesses said that since the abrogation of the Agreement the area practice has been to assign rigging based on efficiency and the nature of the project. The Arbitrator made credibility evaluations of this testimony and made a factual finding that it is no longer area practice to assign work in accordance with the 1971 Rigging Agreement. This factual determination is supported by the evidence and the Court does not find it to be clearly erroneous. Thus, the Trustees argument that Stevens has assigned rigging work in accordance with the 1971 Rigging Agreement in the past is irrelevant. Moreover, because rigging is an assignable task, employers may assign rigging in accordance with the 1971 Agreement or not, depending on the circumstances of each job.

The Trustees' paraphrasing of § 1383 that withdrawal liability attaches if an employer "resumed the same work in the same area" is misleading. Section 1383(b)(2)(B) provides that an employer who has ceased to have an obligation to contribute under a plan must continue to perform "<u>work in the jurisdiction of the collective bargaining agreement</u> of the type for which contributions were previously required, or resume <u>such work</u> within 5 years..." As the evidence in this case has made abundantly clear, the craft jurisdictions of many craft unions overlap and employers assign tasks that fall within the craft jurisdictions of multiple unions in different manners. The Arbitrator's decision here makes clear that assignable work which is assigned by an employer at an NMA pre-job conference falls within the jurisdiction of the union that is assigned the work unless an Umpire finds differently after going through the NMA jurisdictional dispute process. Thus, assignable work that is not assigned to a union is not within the jurisdiction of that union for that job. As Local 17 was not assigned the disputed rigging work

36

on the No. 4 seamless project at issue, that rigging work was not in its jurisdiction and should not form the basis of a withdrawal liability claim. Further, since the work at issue was assigned to the Millwrights, it is not work for which contributions had ever been required to the Fund.  It follows that the Fund may not assess withdrawal liability based upon work which is not within its jurisdiction and for which contribution to the Fund had never been required.[11]

Finally, while the Fund would have received additional contributions if all of the rigging work on the No. 4 Seamless project had been assigned to Ironworkers, its contribution base was not reduced because it received contributions for all work within the Ironworkers' craft jurisdiction from Stevens' contractors who employed them. No non-union labor was used on the project.[12]

The Trustees also argue that the Arbitrator's finding that no withdrawal occurred despite acknowledging that Steven's millwrights performed certain work that had been assigned by Stevens to the ironworkers because the quantity of work performed was *de minimis* and was beyond the scope of employment of the employees who did it without Stevens' direction or authorization is clearly erroneous. The Trustees assert that there is no "*de minimus*" exception in

_____

[11] The Court recognizes the circularity of this argument. There is no dispute that Stevens' has assigned rigging work to ironworkers instead of the millwrights in the past. Thus, "craft jurisdiction" changes from job to job. The Court could find no case in which a pension fund sought to impose withdrawal liability based upon an employer's assignment of assignable work to another craft union. As Arbitrator Sands noted, the MPPAA was not enacted to provide a club for multiemployer pension funds to use in turf wars with other unions (and thus other funds) over craft jurisdiction or to punish an employer for terminating a collective bargaining agreement.

[12] Again, the level of any pension fund contributions will naturally change marginally from job to job based upon the assignment of assignable work.

the determination of whether a withdrawal occurred under § 1383(b). Further, the Trustees argue that the Arbitrator applied the incorrect legal standard to determine that the resumed work was "beyond the scope of employment" of the Stevens employees who performed it.

In his factual findings Arbitrator Sands noted two occasions during the No. 4 Seamless project that Stevens' employees in other unions performed work which had been assigned to ironworkers in the pre-job conference. The first occasion occurred one night in late November 2013, when Stevens' carpenters and laborers were preparing a foundation to be poured the next day and discovered a missing section of rebar that should have been installed during the day. Arbitrator Sands determined that Stevens' workers, without direction or authorization from any Stevens manager, installed a 3-4 foot area of rebar. The next day Bender's Iron Workers foreman, discovered the new rebar and complained to Stevens' Project Manager, Harry Mertz. After investigation, Mr. Mertz confirmed what happened and instructed Stevens' carpenters and laborers that they were not authorized to perform such work.  Stevens' contractor's ironworkers installed all other rebar on the project. (Opinion & Award, at 15-16)

The second occasion occurred on January 24, 2014, when Stevens' General Manager Chet Seroka received an email from Mr. Metzger of Standard Construction stating that millwrights were performing ironworker work. Mr. Seroka investigated and learned that millwrights had begun installing grating and handrails to the charge/discharge machine, which is work that was assigned to the ironworkers not the millwrights in the pre-job conference. Stevens stopped the millwrights and called Bender to do that work. Mr. Seroka told Mr. Metzger that Stevens' employees were not to do any ironworker work and told him that he would ensure that Stevens' NMA assignments were being followed.  Stevens did not receive any other formal or

written complaints from Mr. Metzger or anyone else about millwrights doing work that Stevens had assigned to ironworkers. (Id.)

Ultimately, Arbitrator Sands determined that the work Stevens had assigned to ironworkers that was performed by other unionized crafts without authorization or direction by Stevens amounted to less than 20 hours. To put that in perspective, the Arbitrator noted that Stevens subcontracted 8,000-9,000 ironworker hours to Bender and more to other Local 17 signatory employers, making the unauthorized work less than two tenths on one percent of the work subcontracted to ironworker employers. (Id. at 16-17) As such he determined that this *de minimis* work was "beyond the scope of employment of the employees who did it without Stevens' direction or authorization and that it was accordingly not ironworker work that Stevens continued to perform after termination of its obligation to contribute to the Fund for such work."(Id. at 17) Thus, the Arbitrator did not state that there is a *de minimis* exception to whether a withdrawal occurred under § 1383.  The amount of work done outside the scope of the pre-job work assignments was not the focus. Rather, he found that the small amount of work done by Stevens' employees outside of the pre-job work assignments, was performed without Stevens' knowledge and authorization, and thus, such work was beyond the scope of employment of those employees. As such, the Arbitrator did not assign that work to Stevens, determining that it did not constitute ironworker work that Stevens continued to perform after termination of its obligation to contribute to the Fund for such work.

The Trustees assert that the Arbitrator applied an incorrect legal analysis to determine that the rebar and grating work that was performed by Stevens' employees was beyond the scope of their employment. The Trustees contend that the Arbitrator should have used the test set forth

in *Figueroa v. U.S. Postal Service*, 422 F.Supp.2d 866 (N.D. Ohio 2006). Under Ohio law as set

out in *Figueroa*, an employee acts within his scope of employment if his conduct: (1) is the kind

which he is employed to perform: (2) occurs substantially within the authorized limits of time

and space; and (3) is motivated, at least in part, by a purpose to serve the employer. *Id*. at 874.[13]

Under this standard it is clear that the first element has not been met.  The Arbitrator found, and

the parties do not dispute, that the rebar and grating work performed by Stevens' millwright and

laborer employees was assigned to the ironworkers in the pre-job conference and was never

work which Stevens' millwright and/or laborer employees were employed to perform. As such,

the Arbitrator's conclusion that those millwrights and laborers were not acting within the scope

of their employment with Stevens when they did the disputed work was correct. Accordingly, the

Court finds that it was not improper for the Arbitrator to refuse to attribute that work to Stevens

for the purpose of assessing withdrawal liability.

 The Trustees' final argument is that the Arbitrator erred by failing to consider all of the

Local 17 CBA bargaining unit work allegedly resumed by Stevens at the project which they

assert would have been sufficient to trigger withdrawal liability. Arbitrator Sands evaluated

everything that the Trustees' reviewed or used when making their decision to impose withdrawal

liability on Stevens. This comports with his statutory mandate which was to determine whether

the Fund's determination of withdrawal liability was unreasonable or clearly erroneous. 29

U.S.C. § 1401(a)(3)(A).  In this assignment of error the Trustees assert that the Arbitrator was

wrong in not considering events that the Fund never considered in its determination of

---

[13]

Whether an employee was acting within the scope of employment is a question of law
governed by the law of the state in which the conduct occurred. *Figueroa*, 422 F.Supp.2d
at 874. As such, the Court will review this issue under the *de novo* standard.

withdrawal liability. The Trustees do not dispute that they did not consider this work when making the withdrawal liability decision.  Moreover, Stevens responds that even if the additional items were considered, the Fund's assessment remains unreasonable and clearly erroneous because Stevens did not resume work within Local 17's jurisdiction. The Court makes no finding with respect to whether the additional items are credible or constitute the resumption of work by Stevens in Local 17's jurisdiction. Rather, based upon the evidence produced by the parties, the Court finds that the Arbitrator correctly defined the question he was engaged to resolve; carefully reviewed the all of the documentary and testimonial evidence relevant to that question and did not err in declining to review events that had no relevance to that question –specifically– whether the Trustees' decision to assess withdrawal liability in this instance was unreasonable or clearly erroneous. Based on this record and all of the arguments made to this Court, the Arbitrator's Opinion and Award is affirmed and will be enforced.

In addition to the refund of its interim withdrawal liability payments with interest, Stevens also seeks an award of attorney's fees in connection with this action to enforce. Pursuant to 29 U.S.C. § 1451(e) "[i]n any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." An award of fees under this section is discretionary. *See Central States, Southeast and Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760, 767 (6th Cir. 1987).* Because the attorneys fees provisions of 29 U.S.C. § 1451(e) are similar to the comparable ERISA attorney fees provision, 29 U.S.C. §1132(g), a district court should use the same guidelines utilized by courts under § 1132(g). Id.  These factors are the degree of bad faith or culpability of the losing party; the ability of such party to satisfy an award of fees; whether such award would deter others from acting under similar circumstances; whether the party

41

requesting fees sought to benefit all participants and beneficiaries of a multiemployer plan or to resolve a significant legal question; and the relative merits of the parties' positions. *Id.*

Review of these factors weighs in favor of denying an award of fees.  While the Arbitrator and Stevens contend that the Trustees actions in assessing withdrawal liability may have violated their ethical responsibilities, the Court makes no such determination. Rather, it is clear that the imposition of fees on a struggling fund would harm the fund and its participants. Moreover, as was evident throughout the proceedings here, this case involves unusual circumstances that have not been addressed by courts. While this Court found more merit in the position of the Arbitrator and the employer, the Trustees' position was not frivolous or insignificant. Overall, the unsettled and unique questions presented here militate against the imposition of attorney fees.

## CONCLUSION

For the reasons set forth above, Plaintiff Stevens' request to enforce the Arbitrator's Award is granted and Defendants' request to vacate or modify the Arbitrator's Award is denied. Defendants shall refund Stevens' interim withdrawal liability payments with interest from the date paid.  Steven's Partial Motion to Dismiss Count 2 of the Trustees' Complaint in Case No. 15 CV 1967 is denied as moot.  The Trustees' Complaint in Case No. 15 CV 1967 is dismissed. These actions are terminated.   IT IS SO ORDERED.


_/s/Donald C. Nugent_____
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATE:_ August 24, 2016

42